UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

SAKIRU SALAMI,

    Plaintiff,

v.

JUBILEE ASSOCIATION OF MARYLAND,

    Defendant.

Civil Action No. TDC-20-3532

## MEMORANDUM OPINION

Plaintiff Sakiru Salami, a former employee of Defendant Jubilee Association of Maryland, Inc. ("Jubilee"), has filed this civil action alleging that he was subjected to a hostile work environment, discriminatory termination, and retaliation in the workplace, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (2018). Jubilee has filed a breach-of-contract counterclaim alleging that Salami breached a severance agreement in which Salami waived his right to bring claims under Title VII. Presently pending before the Court are Jubilee's Motion to Dismiss or, in the Alternative, for Summary Judgment, and Salami's Motion to Dismiss the Counterclaim. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Jubilee's Motion will be GRANTED, and Salami's Motion will be DENIED AS MOOT.

## BACKGROUND

### I. Employment History

Salami, a citizen of Maryland who is of Nigerian national origin, first started his employment with Jubilee, a Maryland-based non-profit organization, in July 2005. While

employed at Jubilee, Salami received a number of awards and never received any infractions. Salami was most recently promoted to the position of Director of Program Services, a role in which he reported to Steven Keener. Salami alleges that during a meeting in January 2020, Keener made discriminatory statements based on national origin and color, including that he did not trust Salami's team because "it was full of blacks and Africans." Compl. ¶ 9, ECF No. 1. Keener made similar statements during regular meetings with Salami, which generally occurred twice a week.

At one point, Keener created a new position with supervision over Salami and two other directors, and instead of publicly posting the opening, Keener picked a white person to fill the position.

On March 10, 2020, Salami attended a staff meeting, which included members of the management team, during which he was questioned about supposed favoritism he displayed toward African immigrants in the hiring and firing process. Salami believed that these questions stemmed from an incident that occurred two weeks earlier during which Salami had opposed the firing of two African employees. Salami considered these inquiries "irrelevant, prejudicial, and discriminatory" and raised concerns about these questions to the members of the management team at the meeting. *Id.* ¶ 19.

The next day, on March 11, 2020 at approximately 3:45 p.m., Salami was called into a meeting with Keener and two Human Resources ("HR") Directors. During this meeting, Keener informed Salami that he was being terminated for yelling at the staff meeting the day before. Keener put before Salami a Severance Agreement ("the Agreement") that offered to pay Salami $10,000 in exchange for a release of legal claims. When Salami objected that this was not an adequate remedy for someone with 17 years of service without a single infraction, Keener allegedly stated that he "did not care" how Salami felt and informed him that he had to leave the

premises by 5:00 p.m. or he would call the police to escort him out. Joint Record ("J.R.") 22, ECF No. 22-1. Salami went back to his office to speak with his team about the termination. He then called his wife, who advised him to pack his belongings, sign the Agreement, and leave. Salami asked Keener if he could come back the next day to pack up his belongings and documents, but Keener denied this request. Salami then returned to his office and called his wife a second time, who again advised him that he should "take whatever [he] can," sign the Agreement, and leave. J.R. 23. Salami then signed the Agreement, met with Keener and the HR Director about his team, and left the premises before 5:00 p.m.

According to Salami, throughout these events he was "confused, shaking, and disoriented" with "little sense of what to do," and at no time prior to signing the Agreement did he read the document in full because he was "distraught and distressed." J.R. 22-23. At no time did Keener advise Salami to seek the advice of an attorney. Salami asserts that the threat that the police would be called was a "significant factor in [his] reasoning for signing" the Agreement. J.R. 22.

After his termination, during March 2020, Salami filed an application for unemployment benefits with the Maryland Department of Labor, Licensing, and Regulation ("DLLR"), Division of Unemployment Insurance. In opposing this application, Jubilee's HR Department submitted a letter to the DLLR that used terms and phrases such as "Nigerian gang," "[t]he issue with Nigerians," and "Nigerian issue." Compl. ¶ 31.

Salami alleges that his termination was unjustified because another Jubilee employee, Uju Chukwuka, was not fired even though she had engaged in verbal abuse toward others that resulted in a complaint to HR and in "tirades which are demonstrably worse than any supposed misconduct Plaintiff engaged in." *Id.* ¶¶ 26-27. Salami's position was subsequently filled by a white person.

3

**II. Severance Agreement**

The Agreement signed by Salami granted him a $10,000 severance payment in exchange for a general release covering "all claims arising out of or in relation to [Salami's] employment with Jubilee," including all claims for wrongful termination, discrimination, harassment, and retaliation "arising under any federal, state, or local law, such as claims, to the extent allowed by law, arising under Title VII of the Civil Right Act of 1964." J.R. 7. The Agreement provided a period of 21 days "from the date [Salami] first received a copy of this Agreement to decide whether to accept its terms." J.R. 10. It also provided that if Salami signed the Agreement, he would have a period of seven calendar days after the date of signature within which he could "revoke [his] acceptance of the Agreement." J.R. 10.

> In addition, the first paragraph of the Agreement stated:
>
> Please be advised that, by signing this agreement you will be releasing Jubilee, to the extent allowed by law, from all legal claims you now have, regardless of whether you are currently aware of them. Therefore, Jubilee advises you to take this Agreement home and read it and consult with an attorney before you sign this document. You will have seven days after signing to revoke your agreement.

J.R. 6. Further, the signature page of the Agreement included the following:

> I acknowledge, warrant, and agree that:
>
> 1. I have been advised to discuss all aspects of this Agreement with my private attorney and/or other individuals of my choice who are not associated with Jubilee to the extent that I desire . . .;
>
> 2. I have read the Agreement carefully and fully understand the significance of all its provisions;
>
> 3. I sign this Agreement voluntarily and accept all obligations contained in it in exchange for the consideration I will receive pursuant to the Agreement.

J.R. 11. Just above the signature line, the Agreement stated in all capital letters "The undersigned further state that each has carefully read the foregoing agreement, knows the contents thereof,

4

freely and voluntarily assents to all the terms and conditions thereof, and signs the same as his or her own free act." J.R. 11. Under this statement, Salami signed his name and listed the date as March 11, 2020. Salami received the $10,000 payment by direct deposit.

## III. Procedural History

On July 14, 2020, Salami filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On September 3, 2020, the EEOC informed Salami that it was unable to conclude that there was an actionable violation and issued a right-to-sue notice. Salami filed the Complaint in this case on December 4, 2020. In the Complaint, Salami alleges discriminatory discharge on the basis of national origin and color, a hostile work environment, and retaliation under Title VII. Jubilee has filed a counterclaim alleging that Salami breached the Agreement by filing the present lawsuit.

## DISCUSSION

In its Motion to Dismiss or, in the Alternative, for Summary Judgment, Jubilee seeks dismissal or summary judgment on the grounds that (1) Salami's claims are barred by the terms of the Agreement; (2) Salami failed to exhaust administrative remedies on the hostile work environment and retaliation claims; and (3) Salami has failed to state a plausible claim for relief on his discriminatory discharge claim. In turn, in his Motion to Dismiss, Salami seeks dismissal of Jubilee's counterclaim on the grounds that the Agreement is not valid because he did not knowingly and voluntarily sign it.

## I. Legal Standards

Both Motions seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

With its Motion, Jubilee attaches a Joint Record of documents compiled by the parties, including the Agreement and affidavits by Keener and Salami. Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of Jubilee's Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See*

6

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). Here, Salami has not filed such an affidavit and has not objected to the consideration of the documents in the Joint Record compiled by the parties. The Court therefore will construe Jubilee's Motion as a Motion for Summary Judgment to the extent it relies on the submitted evidentiary materials.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. Severance Agreement

Jubilee argues that Salami's claims are barred because by signing the Agreement, Salami released Jubilee from all claims arising from his employment, including any Title VII claims. Salami, however, contends that based on the circumstances on the day of his termination, he did not knowingly and voluntarily sign the Agreement.

### A. Enumerated Factors

An employee may waive Title VII claims through a voluntary settlement agreement if the waiver was knowing and voluntary. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52 & n.15

7

(1974). In considering the validity of such a waiver, courts consider "the totality of the circumstances." *Cassiday v. Greenhorne & O'Mara, Inc.*, 220 F. Supp. 2d 488, 493 (D. Md. 2002), *aff'd*, 63 F. App'x 169 (4th Cir. 2003). The factors to be considered include: "(1) the employee's education and business experience; (2) the respective roles of the employer and employee in determining the terms and conditions of the waiver; (3) the clarity of the agreement; (4) the time the employee had to study the agreement; (5) whether the employee had the advice of counsel; (6) whether the employer encouraged the employee to seek the advice of counsel and whether the employee had sufficient time to do so; and (7) the waiver's consideration." *Id.* These factors are non-exclusive, and no single factor is dispositive. *Id.*

Salami acknowledges that the first, third, and seventh factors weigh in favor of Jubilee. As to education and business experience, Salami has a bachelor's degree in Psychology and a master's degree in Business Administration, and he worked for Jubilee for 15 years. Salami also does not dispute that, "as written, the [Agreement] contains clear and accurate language," and that, having received the $10,000 severance payment, "the consideration was sufficient." Opp'n Mot. Dismiss at 9-10, ECF No. 18-1.

As to the second factor, the respective roles of the employer and employee in setting out the conditions of the Agreement, the Agreement appears to be a standard form agreement with language drafted entirely by Jubilee, and there is no evidence that Jubilee was willing to engage in any negotiations over different terms. At the same time, there is also no evidence that Salami was precluded from seeking to negotiate for different terms. Overall, this factor weighs in favor of Salami but is not dispositive. *See Cassiday*, 220 F. Supp. 2d. at 493-94 (finding that an employee knowingly and voluntarily signed a Title VII waiver even though the employee did not negotiate its terms where there was no evidence that the employee was precluded from such negotiations);

*Randolph v. Caruso Homes, Inc.*, No. RWT-13-cv-2069, 2014 WL 4661985, at *5 (D. Md. Sept. 16, 2014) (finding that an employee knowingly and voluntarily signed a release of legal claims against her employer even though the employee was not involved in setting the terms of the agreement).

As for the fourth factor, Salami correctly notes that he had very little time to review the Agreement before he was required to leave the premises at 5:00 p.m. on the date of his termination. The Agreement itself, however, counters this point. By its express terms, Salami had 21 days to decide whether to sign the Agreement. Significantly, Salami does not claim that anyone told him that he had to sign the Agreement before 5:00 p.m. In addition, the Agreement specifically provided that Salami had seven days after he signed it to revoke his execution of the waiver, and Salami does not claim he did not have access to a copy of the Agreement after he signed it. Thus, despite the fact that Salami did not take a significant amount of time to consider the Agreement prior to signing it, he in fact was given ample opportunity both before and after executing the Agreement to decide whether he would voluntarily waive his right to bring Title VII claims in exchange for the severance payment. *See Randolph*, 2014 WL 4661985, at *5 (finding a waiver to be knowing and voluntary, even though the employee did not have much time to study it and felt pressured to sign it on the spot, because the employee still had seven days after executing the release to change her mind and revoke it).

Finally, on the fifth and sixth factors relating to advice of counsel, Salami asserts that Keener did not encourage him to consult with an attorney before signing, and that he did not, in fact, secure any advice of counsel before he signed the Agreement. While these facts are undisputed, the Agreement explicitly advises the employee, in two different places, to seek the advice of counsel before signing it. Specifically, the first paragraph of the Agreement states,

9

"Jubilee advises you to take this Agreement home and read it and consult with an attorney before you sign [it]," J.R. 6, and immediately before the signature line, the Agreement contained language stating that by signing it, Salami was acknowledging that, "I have been advised to discuss all aspects of this Agreement with my private attorney and/or other individuals of my choice who are not associated with Jubilee to the extent that I desire." J.R. 11. So even though Salami did not engage with counsel before he signed the Agreement, he was explicitly advised to do so, and between the 21-day period to sign the Agreement and the seven-day revocation period, he had sufficient time to do so. *See Randolph*, 2014 WL 4661985, at *5 (finding a waiver knowing and voluntary where even though the employee did not have the advice of counsel, the express terms of the release encouraged the employee to seek counsel and there was a seven-day revocation period); *Alexander v. UIP Property Mgmt.*, No. DKC-14-2469, 2016 WL 125605, at *5 (D. Md. Jan. 12, 2016) (finding that the failure to seek advice from counsel was counteracted by the employee's ability to seek legal advice during the seven-day revocation period).

### B. Other Considerations

Salami further argues that as to whether he knowingly and voluntarily executed this contract, the Court should look beyond the seven factors and also consider: (1) the threat of police action communicated by Keener; (2) the influence of Salami's wife and her statements; and (3) Salami's emotional distress which, he alleges, caused him to fail to read the Agreement. To the extent that Salami argues that these circumstances rendered the waiver "invalid," Opp'n Mot. Dismiss at 12, the Court finds that even accepting Salami's version of events, they do not provide a basis to invalidate the Agreement.

First, while Jubilee does not dispute that Keener told Salami that he must vacate the premises before 5:00 p.m. or the police would be called, Salami does not allege that Keener told

him that he had to sign the Agreement by 5:00 p.m. that day, or that the police would be called if he failed to do so. Thus, even though based on the threat to call the police, Salami may have reasonably felt pressured to collect his belongings and leave by 5:00 p.m., that threat does not suggest improper coercion to force Salami to execute the Agreement, which on its face gave him a 21-day period within which to sign.

Second, although Salami claims that his wife's advice that he sign the Agreement and leave the premises "had some influence" on Salami's decision to sign the Agreement, such facts are not legally relevant to the analysis of whether Salami voluntarily accepted the Agreement. Opp'n Mot. Dismiss at 11. Jubilee is not responsible for the advice provided by Salami's wife. If anything, the fact that Salami was able to, and did in fact, consult with his wife on two separate occasions, and also was able to speak with members of his team before executing the Agreement, weighs against a finding that he acted involuntarily. *See Alexander*, 2016 WL 125605, at *4 (upholding the execution of a severance agreement waiving legal rights where the plaintiff was at her normal place of employment, the conversation with her supervisor proceeded in a normal tone of voice, and the plaintiff was able to ask questions, despite the fact that the supervisor locked the door from the inside during the meeting and told her she needed to sign the agreement in order to receive the severance benefits).

Third, while Salami was undoubtedly distressed from his unexpected termination, such that he was shaking after receiving the news from Keener, the argument that as a result Salami did not read the Agreement is not a reason to find that the waiver is unenforceable. In Maryland, "[u]nder long-settled law, if there is no dispute" that an individual signed a contract, the individual is "presumed to have read and understood those documents as a matter of law." *Windesheim v. Larocca*, 116 A.3d 954, 963 (Md. 2015). Salami acknowledges that he signed the Agreement,

which includes explicit statements, in bold text above the signature line, that by signing he was acknowledging, "I have read the Agreement carefully and fully understand the significance of all of its provisions" and stating that he "knows the contents" of the Agreement and "freely and voluntarily assents to all the terms and conditions" as his "own free act." J.R. 11; *see Cassiday*, 220 F. Supp. 2d at 494 (relying in part on the fact that the plaintiff expressly affirmed that she was signing the agreement "knowingly and voluntarily").

### C. Knowing and Voluntary

Considering all of the circumstances, the Court finds that Salami's execution of the Severance Agreement and its waiver of Title VII claims was knowing and voluntary. Notably, judges in this District have found a knowing and voluntary Title VII waiver under similar facts. *See, e.g., Randolph*, 2014 WL 4661985, at *5 (finding a knowing and voluntary waiver where the plaintiff felt pressured to sign on the spot and did not receive advice of counsel, and where the severance agreement provided two weeks of pay as consideration, encouraged the plaintiff to seek advice of counsel, and granted a seven-day revocation period); *Alexander*, 2016 WL 125605, at *5 (finding a knowing and voluntary waiver where the plaintiff, a high school graduate with lengthy work experience, signed the severance agreement on the spot without receiving legal advice, despite a claim that she was intimidated by her supervisor, and where the agreement provided over $3,000 as consideration and had a seven-day revocation period).

Likewise, upon consideration of the seven factors and the additional circumstances identified by Salami, the Court finds that particularly where the face of the Agreement allowed Salami to have time to consider whether to sign it, advised him to seek legal advice, and provided for a revocation period, the waiver was knowing and voluntary. Even if the circumstances faced by Salami on the day of his termination could be deemed to have rendered his execution

12

involuntary, the fact that Salami had a seven-day period within which he could have revoked his waiver, but did not do so, establishes that his waiver is properly deemed to be voluntary. *See Alexander*, 2016 WL 125605, at *4-5; *cf. Young v. Anne Arundel Cnty.*, 807 A.2d 651, 693 (Md. Ct. Spec. App. 2002) (stating that even if a contract was signed under duress, the injured party must act to repudiate the agreement promptly after the removal of the duress, or that party will be deemed to have ratified the contract (citing *Blum v. Blum*, 477 A.2d 289, 294 (Md. 1984))).

Because Salami is bound by the terms of the Agreement, his claims are subject to dismissal. Accordingly, the Court need not address Jubilee's arguments for dismissal of Salami's claims on the merits. Jubilee's Motion will be granted.

## III. Counterclaim

Having dismissed all of the federal claims in the Complaint, and noting that diversity jurisdiction is inapplicable because the parties are both citizens of Maryland, *see* 28 U.S.C. § 1332 (2018), the Court must consider whether it retains jurisdiction over what remains in this case. *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998) (stating that a court has a "duty to inquire, *sua sponte*, whether a valid basis for jurisdiction exists, and to dismiss the action if no such ground appears"). Up to now, the Court has had subject matter jurisdiction over the state law claims in Jubilee's counterclaim because under the doctrine of supplemental jurisdiction, a federal court may exercise jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction over state law claims when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *Lang v. Manufacturers & Traders Tr. Co.*, 274 F.R.D. 175, 184-85 (D. Md. 2011) (declining to exercise supplemental jurisdiction over a breach of contract counterclaim

after the court dismissed the claims over which it had original jurisdiction). Here, the Court has dismissed the claims over which it had federal question jurisdiction. Thus, the Court will decline to exercise supplemental jurisdiction over the remaining state law breach of contract counterclaim, which will be dismissed without prejudice.

In turn, Salami's Motion to Dismiss the Counterclaim will be denied as moot.

## CONCLUSION

For the foregoing reasons, Jubilee's Motion to Dismiss or, in the Alternative, for Summary Judgment will be GRANTED, and Salami's claims will be dismissed. Jubilee's state law counterclaim will be dismissed without prejudice. Because all claims will be dismissed, Salami's Motion to Dismiss the Counterclaim will be DENIED AS MOOT. A separate Order shall issue.

Date: July 2, 2021

THEODORE D. CHUANG
United States District Judge